The first case for argument this morning is 16-2087, Linkgine v. VigLink. Ms. Bolt, whenever you're ready. Good morning, Your Honors. May it please the Court, I'm here together with my co-counsel representing Linkgine in this appeal. In preparing for this oral argument, we did an analysis of the decisions from this Court since the decision from the U.S. Supreme Court in the Alice case, and since the enactment of the AIA, which included this new role that the PTAB has taken on in reviewing patents, like in our case, that have been determined to be a CBM patent. And we learned a lot from doing that analysis because we think it helps provide the context for what went wrong in this case. At the time that the PTAB decided that this case was a CBM case subject to CBM review, they had no direction yet from this Court. When you look at the timing, those decisions were rendered before this Court issued its decision in Versada, before this Court issued Sightsound, before it issued Blue Calypso. And even in Versada, the Court talks about the fact that the technological invention exception to CBM review But you say the Board had no guidance from this Court. Well, we have. And we can read the claim. And the claim is passing data back and forth, right? No, Your Honor. What our claim actually does is it transforms data. It modifies data. And this is where we believe It allocates commissions. No, Your Honor, it does much more than that. It transforms data from an affiliate code, which is a very specific code. And it's our position that that's where the Patent Trial and Appeal Board erred because they didn't understand the basic definition of the affiliate code. The affiliate code is specifically defined in our patent. It's defined as a code that is provided to the first person. So like in our example that we give in our brief, we use the example of Rose. And she's trying to maximize payments. She's a blog writer. She writes and she wants to maximize her ability to earn money from writing this blog. So if she's a LinkedIn client, she has an affiliate code from very specific merchants, sellers. And that code can change over time for any number of reasons. One thing that I like to analogize it to is we've all had the experience of our credit cards where for whatever reason fraud was detected on your card or you lost your card and you had to ask American Express or Visa for a new card. But maybe your Comcast bill was on auto pay. Well, all of a sudden, when that one code that's on your credit card becomes invalidated, then Comcast no longer recognizes that credit card. So in the affiliate world, on the Internet, people that are trying to maximize their participation in the affiliate program have that exact same problem. There are times that those affiliate codes, they become stale, they get changed, or for whatever reason they're no longer valid and they're no longer recognizable. So what our patent does is when that affiliate code is present in the text, our patent recognizes that the code is stale and modifies the code. Isn't this all software rather than improvements in the computer? No, Your Honor, I think it is a direct improvement in not just the computer but in the way in which the computer interacts with the Internet. And when we look at some of the decisions from this court, like the DDR case and EnFish, when you look at those, they're looking for the improvement in the technology. And clearly, since we've studied all the cases, we know the information that Your Honor and the rest of Your Honors want from us in making that analysis. So in our brief, one of the things we did is we specifically identified the technological problem, the technological solution, and then where that is in our claim. The PTAB held that your claims were not limited to the Internet and were not focused on that as in the DDR case. What is your response to that? What particular language in your claim are you relying on? Is it the URL language or is it something else? Well, I think it's specific with respect to the affiliate code and that the modification of the affiliate code is the most important thing. And I think one of the points that goes to what you're asking is the PTAB's finding, consistent with DDR, that our patent is not Internet-centric. Well, when you look at what our patent does, there is no function without the Internet. That's why the bookstore example doesn't work, because you can't even consider our patent outside of the Internet context. It deals with the affiliate program. The affiliate program that we're talking about and that our patent is attempting to maximize the participation in only exists in the realm of the Internet. So what our patent does is it improves the functionality between the computer and how the computer is interacting and performing with things on the Internet. So without the Internet, our patent has no function. If we agree with you, we have to look at the prior offer objection, right? That's correct, Judge. That's correct. And we believe that that's easily decided in our favor as well, because when you look at Landau, Landau is specifically different than our patent in two very important ways. Landau does not modify an affiliate code. And where we think the PTAB erred is in not fully doing a full claim construction analysis, similar to a Markman hearing, before they went off and interpreted the patents. So without knowing the definitions and without having a clear understanding of very important terms, it's impossible to do the proper analysis. So the other difference, and I want to go back to that one in a moment, because there's really two differences with Landau. And as the Court knows, we really only need one difference, and that satisfies where it's not anticipated. I understand that the Board only construed automatically? Correct. What other terms did you ask the Board to construe? We asked them to construe four terms. The terms that we asked them to construe are and the other side asked for four different terms too, but the ones we asked for were affiliate-capable merchant, preferred affiliate code, and we proposed that that definition is the same as preferred commercial agent, modified data, and then automatic automatically. So this sort of goes back to the point I was making originally about the CBM issue. When you look at their order, and I do think this is important, Judge Stoll, so I sort of want to walk you through the procedure of this. The other side files their petition. They ask for four terms to be construed, first computer, intermediary computer, server, and serving. In our preliminary response, we ask for the four terms I just went over with you. Then the next thing that happens is the orders granting CBM review. In those orders, when you read what the Court did, you're not clear at all. When you read what the Board did? Yes, yes, Judge. When you read what the Board did, you're not clear at all whether they accepted everyone's terms, whether they didn't accept those terms. They only say that they're going to interpret automatic automatically. And so then when you go forward and you look then at their analysis, what our position is is that if they did accept our definitions, which is one interpretation that they accepted the definitions that everyone else proposed, our position is that they didn't apply them properly. And when you go further down the line to the oral argument, and when you look at the oral argument and where they're talking about code, which sort of goes back to a point I think you were making just a few moments ago, Judge Lori, they ultimately conclude at the oral argument, and it's very clear there, that they just see it's just code replacing code, that there's no functionality in the code, it's just code replacing code. And that's not accurate. What our patent does is it's looking for very specific code, code that has a very specific function, and it is replacing that code with a different code that has a very specific function. And so what we believe they lost is some of these fundamental definitions that make it necessary to do the 101 analysis, both steps of that, that make it necessary to do the Landau analysis and the Priest analysis. Because if you're not working with the right terms, and you're not working, and you don't have an understanding of what those terms mean, vis-a-vis our patent, then it necessarily leads you to an improper determination. For example, talking about the prior art with Landau, they say, the PTAB says, that the Webmaster ID is the same as an affiliate code. It's absolutely not. So it's your position that even though post-institution, those claim construction issues weren't addressed by your client, that that's not a waiver? You had no obligation to address those, even though the PTAB's institution decision didn't address them? Our position is that they were continually addressed throughout the whole rest of the proceeding. When you read the oral argument, it's almost as though everyone is still doing claim construction at the oral argument. And there's still all of this talk about what the terms mean. And then when you get to the final decision, they make a decision based on their definitions of the terms. So if we can show that their definitions of the terms are incorrect, it would be no different than if they had, let's say they had issued some other order and had said, here's how we're defining all the terms, if the board had said that. If that was wrong, we would still be able to raise that at this stage before the court. So in other words, when their final decisions reach the wrong result because of a misinterpretation of those terms, our position is there's no way that's waiver, particularly when this is discussed at length at the oral argument. Can I just take you back to the very first point you were making about the CBM? I wasn't clear on, was your take, you started by saying that there are all these intervening cases. Is it, were you trying to argue that this is not a CBM patent? Yes, that is our position. And you're relying on the portion that talks about technological innovation? Yes, Judge. And your view is what? Recent cases demonstrate that this is a technological innovation? Yes. Okay. And my point was primarily that the PTAB didn't have a lot of direction with all of the case law that's now coming out from this court. There is a series rapidly, you know, this court is issuing opinions on this issue. What I was unclear on is on what issue. I mean, are there cases now that are saying these aren't CBMs because they're technological innovations? There's actually been a few cases that have come out, even since all of our briefing was done, I think cases that help frame the issue, like even the cases that are more on the 101 and 102 analysis. For example, EnFISH. EnFISH came out afterwards. BASCOM came out afterwards. Amdocs came out afterwards. Now, all of those are doing, are not doing a CBM analysis, but they're doing, they're reviewing 101 and inventive concept. And when you look at Versada, what Versada does on a CBM analysis is when it's looking at the technological invention. So you're saying that under our case law, you're sort of morphing the Part 2 of the CBM definition of technological innovation and the Step 2 of the ALICE analysis, which is whether they're inventive concept. I'm just trying to understand that. Right. That is certainly what Versada does. I'm saying that I think if you look at just the definition, even though it's not particularly helpful, as Versada says, if you're looking for a technological problem and a technological solution, I think just on that basic definition, this should not have been subject to CBM review. But when you look at what Versada does, Versada sort of pulls in the inventive concept analysis, Step 2 of ALICE, to help make that decision by saying, is there improvements in the computer and all of those things. I'm well into my rebuttal, so I would just like to preserve some time. Thank you, Judge. Good morning, Your Honors. May it please the Court. Richard Martinelli representing Skimlinks and VigLink. I think we're through the looking glass on this appeal. The systems that LinkGene is describing to try and save its patent bear no resemblance to what's described in the specification, what's claimed, and even what they argued to the board. The LinkGene patents don't have anything in them about choosing among a number of potential preferred affiliates which one you want to use. It assumes that the system knows who the preferred affiliate is and just wants to check and see if that's who's going to get this commission. The systems also don't disclose anything about choosing among merchants to say, okay, a webmaster can direct their sale to one merchant one day and one merchant another day. There's nothing like that in there. The patents don't even disclose a system to help a webmaster like Rose. The one concrete example that this patent gives about the utility of its system is in column four in the last paragraph. It describes the situation of a small website that makes some sales through a larger web merchant like Amazon. And the system, as described in that paragraph, is operated by a third party who gets in between the customer of the small merchant and the big merchant and says, do we really want this small website to get this commission? Is it the person we prefer? And if it's not, they manipulate the commission system and redirect it. The appellants also talk a lot about the advantage of the fact that their system Are you heading for an argument on 101 or 102? I think 101 handles this pretty readily. I'm actually sort of confused at what they think their invention is. I think their invention is so abstract that they have trouble keeping straight exactly what they're doing. They describe a general goal of changing a commission ID from one person to another, replacing one code with another code, basic data manipulation. This is something that is well within the bar of cases that this court has routinely found ineligible since Alice. Simply applying a commission system on the Internet and having basic ministerial functions to change one code to another is exactly the sort of thing that isn't eligible without a specific technical application. Do you agree that the claims are Internet-centric? No. There's a first computer and a second computer, but they don't actually specify any details about that computer. What about the fact that what they're talking about is uniform resource locators, URLs? Doesn't that bring it into the realm of the Web and the Internet? It slightly suggests that, but to be honest... What does it suggest other than that? Well, URLs are actually broader than running on the public Internet. You can have an internal system that has a URL to go on a purely internal website. But frankly, I don't know that that matters because there's been plenty of systems in this court that have been Internet-centric that have been found to be patent ineligible. So simply moving a commission system to the Internet doesn't make it patent eligible, even if it is running on the Internet. So a good example of that would be, I think, BySafe and even some of the other commission systems that have been held ineligible. So... I think probably just to sum up here, because I actually think that our briefing handles this pretty well, what I find in reading all these cases is that the patents that are found eligible have a very clearly articulated technical problem and they match that clear technical problem up with a specific technical solution and then they claim that solution. That's not present in the LinkedIn disclosure and it's not present in the LinkedIn claims. To the extent they have a goal of maximizing participation, there's no specific, unique technical solution to that problem. In fact, when you look at the background or the specification, they don't even mention actual computers. The word computer doesn't appear in their description of all their different systems. There's no system architecture that shows the different devices and how they interrelate with one another. There's not even a requirement in the description of who needs to run the system. The specification generically talks about the system being run by the user, meaning the web browser, an ISP. It can basically be anywhere. It just needs to be on some computer. So I think the briefs actually cover this all pretty well and I'm here for the court if you have any specific questions. Thank you. I think that when you look at our specifications, it's clearly Internet-centric. You know, we have to think back to the time before computers connected to the Internet. Back in the day, they really were fancy typewriters. They were typewriters that could remember everything and we all began word processing on stand-alone computers that had no connection to the Internet. Do you think under our cases that being Internet-centric matters? I think it does matter. It matters to what our invention is. One of the ways in which the PTAB aired, because in our position our opponents led them down that road, is they bought this bookstore analysis. But when you look at our claims, our patent doesn't function without the Internet. And throughout our specifications, we talk about the affiliate program and how it exists on the Internet and there's nothing about what we've patented that can be performed in the real world, which is why we believe, really, the train got off the track from the very beginning and then there was no... Didn't the Supreme Court in Alice hold that, you know, just because you have something and you say, do it on a computer, that in itself doesn't make it eligible? How is this different from that? Just doing it on the Internet is not going to make it something that's eligible. I agree with you. That's what Alice says. But what we do is we have very specific code. So Rose cannot get paid if the code is not properly... The right code is the way I should say it. So when the sale happens, if the code is not right, she doesn't get paid. Our system, before the user ever receives the page back on the Internet, so in our position, this case is a lot like Bascom. It's like Enfish. I think Bascom is the one where they're filtering content. Before the page ever comes back to the user on the computer, the data is modified and the data is changed. And it's specific data. It's specific code. It's not just any code. It's an affiliate code that is changed to a preferred affiliate code. It only arises in the Internet. And so, for example, if you just had a magazine, let's say Rose, instead of putting her article on the computer, her blog, let's say she wrote a magazine article and it was in a magazine. This doesn't arise in that context. It can only arise because of the connection to the Internet. And I think the Internet-centric point, Judge Lori, goes to the fact that we're solving a problem. Thank you. Thank you so much. We thank both sides. The case is submitted.